IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JAMES MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-4258-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James Monroe seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of plaintiff's treating psychiatrists. For the following reasons, plaintiff's motion for summary judgment will be granted.

## I.    BACKGROUND

On October 4, 2010, plaintiff applied for disability benefits alleging that he had been disabled since July 1, 2006, later amended to December 31, 2009. Plaintiff's disability stems from bipolar disorder, anxiety disorder, depression, and post traumatic stress disorder. Plaintiff's application was denied on March 25, 2011. On June 14, 2012, a hearing was held before an Administrative Law Judge. On July 2, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 4, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the

2

Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Gary Weimholt, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1976 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $ 195.00 | 1995 | $ 25,956.00 |
| 1977 | 478.26 | 1996 | 27,372.00 |
| 1978 | 1,308.51 | 1997 | 28,340.10 |
| 1979 | 1,300.00 | 1998 | 30,711.00 |
| 1980 | 7,903.14 | 1999 | 31,487.00 |
| 1981 | 10,956.89 | 2000 | 32,945.14 |
| 1982 | 13,066.00 | 2001 | 36,476.35 |
| 1983 | 14,142.00 | 2002 | 35,682.86 |
| 1984 | 15,576.00 | 2003 | 36,472.95 |
| 1985 | 17,794.00 | 2004 | 37,280.42 |
| 1986 | 19,896.00 | 2005 | 37,944.72 |
| 1987 | 20,562.00 | 2006 | 22,517.58 |
| 1988 | 19,366.35 | 2007 | 7,114.86 |
| 1989 | 18,670.64 | 2008 | 16,906.66 |
| 1990 | 22,986.00 | 2009 | 1,823.76 |
| 1991 | 23,256.00 | 2010 | 0.00 |
| 1992 | 23,256.00 | 2011 | 0.00 |
| 1993 | 23,011.95 | 2012 | 0.00 |
| 1994 | 24,538.00 | | |

4

(Tr. at 202-203).

**Function Report - Adult**

In a Function Report dated February 21, 2011, plaintiff stated that he watches television, eats, and spends the rest of his day thinking about things he should have done differently or his old job (Tr. at 234). Plaintiff bathes about twice a week, and he wears a hat instead of caring for his hair (Tr. at 235). He cleans for about an hour a week, and he does laundry for about an hour each week (Tr. at 236). Plaintiff cannot go out alone - the anxiety is overwhelming (Tr. at 237). His impairments affect his ability to remember, complete tasks, concentrate, understand, and follow instructions (Tr. at 239).

**B.      SUMMARY OF MEDICAL RECORDS**

On April 13, 2011, plaintiff saw a counselor and was observed to be disheveled with circles under his eyes (Tr. at 553). He appeared fatigued and depressed. His affect was flat with a depressed mood. Speech and thought processes were slow and he was tearful at times. "James continues to verbalize a need to change his life, but has had little motivation to follow through with anything that could enhance his life."

On April 27, 2011, plaintiff saw Ambreen Ahmed, M.D., a psychiatrist (Tr. at 550). Plaintiff reported feeling very depressed and down, he had no motivation, had no energy and was feeling hopeless. She noted that his concentration was low. She continued Lithium (treats mania that is part of bipolar disorder) and Vistaril (treats anxiety) and she added Saphris (an antipsychotic used to treat bipolar disorder). She told him to reduce his dosage of Zoloft (antidepressant).

On April 29, 2011, plaintiff was observed to have a flat and blunted affect with a dysphoric (unhappy), depressed mood. His speech and thought processes were slowed. "He complained of fatigue and stated that he no motivation to do anything."

5

On May 18, 2011, plaintiff saw Dr. Ahmed (Tr. at 546-548). Plaintiff had no motivation, no energy, low interest. He continued to have depression. His concentration was low. Dr. Ahmed continued his Lithium (treats bipolar disorder) and Vistaril (treats anxiety) and prescribed Seroquel (an antipsychotic used to treat bipolar disorder).

On May 20, 2011, plaintiff was observed to be disheveled and fatigued (Tr. at 545). His mood was flat with a drawn affect. He reported paranoia. "His speech was pressured with slowed thought processes. At times he was almost listless."

On June 3, 2011, plaintiff was observed to be slouching in his chair (Tr. at 544). "He continues to struggle with chronic fatigue." His mood was dysphoric with flat constricted affect. Thought processes were slow and tangential with monotone speech. "James won't go to his grandson's baseball games because the mother-in-law works for the same agency he was fired from."

On June 15, 2011, plaintiff saw Dr. Ahmed (Tr. at 541-543). Plaintiff reported feeling very depressed and down, he said he did not think the medications were working. "He said can't concentrate, if goes out have panic attacks, at home he feels miserable." Plaintiff's interest was low, his motivation was low, his concentration was low. She prescribed Lithium (treats bipolar disorder) and Vistaril (treats anxiety) and she increased his Seroquel (treats bipolar disorder).

That same day Dr. Ahmed completed a Medical Source Statement - Mental (Tr. at 605-606). She found that plaintiff was markedly limited (i.e., resulting in limitations that seriously interfere with the ability to function independently) in the following:

- The ability to understand and remember detailed instructions
- The ability to carry out detailed instructions
- The ability to maintain attention and concentration for extended periods

6

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

She found that he was extremely limited (i.e., no useful functioning in this category) in the following:

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

On June 17, 2011, plaintiff was observed to be lethargic (Tr. at 539). He reported being restless and paranoid. "He was also tearful for no reason while in session. Affect was flat except for unexpected tearfulness. His speech was monotone and thought processes were slowed." Plaintiff reported panic attacks with no precursors.

On July 1, 2011, plaintiff was observed to have a flat affect with some tearfulness (Tr. at 538). "His hands continue to tremble some but he reports this has gotten better. Mood continues to be depressed with some agoraphobic symptoms."

On July 13, 2011, plaintiff's counselor observed that his affect "continues to be flat and blunted with depressed mood. Thought processes were slowed." (Tr. at 537).

On July 27, 2011, plaintiff's counselor observed that he "appeared fatigued and lethargic." (Tr. at 536). He had dark circles under his eyes and had difficulty keeping his eyes open. "He reported that he is sleeping all the time and having difficulty functioning. Mood was depressed with flat affect. He seemed to barely have the energy to speak."

On July 28, 2011, plaintiff saw Dr. Ahmed (Tr. at 533-535). He said he felt like the medications were not working. His anxiety was bad, he was having panic attacks for no reason, he was depressed. Dr. Ahmed noted that plaintiff's interest was low, his motivation was low, his concentration was low. She prescribed Lithium (treats bipolar disorder), she increased his Vistaril (treats anxiety), and she increased his Seroquel (treats bipolar disorder).

On August 25, 2011, plaintiff saw Dr. Ahmed (Tr. at 523). Plaintiff had not noticed any change in his symptoms despite his medication. He discussed having been in a long-term abusive relationship. He said his anxiety was better at home but bad if he has to go out. He continued to be depressed. His interest was low, motivation was low, his concentration was low. Dr. Ahmed prescribed Lamictal (mood stabilizer), Lithium (treats bipolar disorder), and Vistaril (treats anxiety).

On August 31, 2011, plaintiff's counselor observed that he moved slowly and "had little to say in the way of greeting." His affect was flat with dysphoric and despondent mood. Thought processes were slowed (Tr. at 522).

8

On September 8, 2011, plaintiff's counselor met with him at his home (Tr. at 520). She arrived at noon and noted that he was still in bed.

On September 12, 2011, plaintiff told his counselor that his parents felt his sexual orientation was a disorder and had sent him to therapy for it (Tr. at 518).

On September 19, 2011, plaintiff's counselor noted that plaintiff was unable to find anything that he likes about himself (Tr. at 516).

On September 21, 2011, plaintiff told his psychiatrist, Dr. Ahmed, that his anxiety is better at home but bad if he goes out (Tr. at 513-515). He continued to suffer from depression. He had low self esteem, low interest, low motivation, guilt feelings, low concentration. Plaintiff reported that in 2008 he started gambling and wound up with a gambling addiction. He has anxiety, he worries a lot, he feels like something bad is going to happen. Plaintiff reported having been in an abusive relationship for 14 years, and he reported childhood sexual abuse. Plaintiff had not used any substances since April 2008. Plaintiff said he would like to get a second opinion from Dr. King, and Dr. Ahmed told him to follow up with Dr. King.

On September 26, 2011, the counselor noted that plaintiff was unable to find anything positive about himself (Tr. at 511). Plaintiff talked some about his childhood sexual abuse and how it has impacted him as an adult.

On September 28, 2011, plaintiff indicated he wanted to try to use public transportation but he was nervous about this (Tr. at 509).

On September 30, 2011, plaintiff's counselor noted that he was tremulous and had difficulty with memory (Tr. at 508). Plaintiff had requested that his doctor release him to see another psychiatrist.

On October 6, 2011, plaintiff talked some about his childhood sexual abuse and the life-long effects of that (Tr. at 506).

On October 12, 2011, plaintiff "seemed depressed as evidenced by his lack of pleasure in anything discussed and reports of feeling hopeless." Plaintiff did not have a very good outlook on himself and talked about his childhood (Tr. at 504).

On October 17, 2011, plaintiff saw Suzanne King, M.D., a psychiatrist, to establish care (Tr. at 499-500). Plaintiff felt like he was not getting anywhere with his previous doctor. "The patient . . . stated that his therapist and him had decided he should decrease his Seroquel dose due to having some shakiness. I did discuss with the patient about how it is important not to follow advice from therapist when it comes to meds. It is best decided by a psychiatrist or a medical doctor." Plaintiff was taking Lithium (treats bipolar disorder), Seroquel (treats bipolar disorder), Vistaril (treats anxiety), and Remeron (antidepressant). Dr. King noted that plaintiff's mood and affect were depressed. She assessed bipolar affective disorder, depressed with a history of recurrent depression, and anxiety disorder not otherwise specified. She increased his Seroquel dose and continued the other medications.

On October 18, 2011, plaintiff reported that he was having trouble bouncing back from losing everything six years earlier (Tr at 494-497). "I lost who I am. I am having trouble bouncing back from that. I've got massive amounts of depression, guilt and shame and you name it." Plaintiff reported that his depression "affects his interest in activities significantly." Plaintiff had been attending Pathways for a year by then. "He has tried several different medications and feels that none of them have helped improve his mood." Plaintiff's mother had regained her strength since having a stroke and he did not need to assist her. He reported at least one panic attack per day. He was using Lithium (for bipolar disorder), Seroquel (for bipolar disorder), Vistaril (for anxiety), and Remeron (for depression). He had not used any

10

alcohol or drugs in the past three years. "He reports staying with his mother limits his ability to use." Plaintiff reported constant depression, extreme anhedonia (the inability to experience pleasure), lack of motivation, feelings of guilt and shame, fatigue, and lack of energy. "His depression interferes with his interest in working and caring for himself. . . . James seems to have little hope that his mood or life will improve. . . . He has become frustrated with psychiatrists, as he feels none of the medications which he has taken have improved his mood." The counselor noted that plaintiff had an extremely difficult time identifying his strengths

On October 19, 2011, plaintiff reported that he was depressed and "nothing gives him pleasure, even things that should such as his grandchildren. He feels ambivalent about many things which causes him confusion. . . . He admitted most of these things caused him to drink in the past." The counselor observed that "it is very hard to [get] James to think of anything positive about himself."

On October 21, 2011, plaintiff said he was very stressed out (Tr. at 491). His affect was flat with dysphoric mood. "Thought processes were tangential."

On October 26, 2011, it was noted that plaintiff's thoughts were "somewhat unorganized." (Tr. at 487). His demeanor was depressed.

On November 9, 2011, it was noted that plaintiff's mood was depressed and his responses were slow (Tr. at 485). "Speech was slow and disorganized as were his thoughts." Plaintiff was noted to worry and obsess over what he has lost in his life. "James was depressed today and came in looking tired. He admits to feeling depressed and that he can't shake the feeling that he messed up his life to the point that he can't get it back. . . . [He] feels like the 'spinning thoughts' in his head are 'manic.'" The counselor discussed how those spinning thoughts lead to anxiety which leads to stress.

11

On November 30, 2011, plaintiff was observed to have a depressed mood with delayed responses (Tr. at 602). His speech and thoughts were disorganized. Plaintiff reported having "a lot of clutter" in his head.

On December 1, 2011, plaintiff saw Glenna Burton, M.D., a psychiatrist (Tr. at 564). The record reflects that plaintiff's mood "has been very depressed [for] yrs." His energy was low. Initiative was poor. "It is hard to make decisions and he has crying spells." He felt hopeless and suicidal. Dr. Burton noted symptoms of obsessive compulsive disorder because plaintiff "pulls eyebrows out." He was suffering from mood swings. Most of this record is illegible.

On December 5, 2011, plaintiff stated that he did not think his medications were working because he continued to have increased feelings of depression, he was sleeping more than 12 hours per day, and he had an increased desire to isolate himself (Tr. at 599-601). He saw Dr. King that day as well, and the doctor noted that his mood and affect were more depressed. She continued his Lithium (for bipolar disorder), switched him to Seroquel XR (extended release, treats bipolar disorder), increased his Remeron (antidepressant), and added Cogentin (treats tremors caused by other medications).

On January 11, 2012, plaintiff discussed how he was handling his memories about childhood sexual abuse (Tr. at 594).

On January 12, 2012, plaintiff saw Dr. Burton (Tr. at 562-563). Plaintiff had been taking Seroquel in place of Vistaril (for anxiety) and had been sleeping the past two nights. He was eating only once a day. The records discuss plaintiff's childhood sexual abuse. Dr. Burton observed that plaintiff was anxious and was shaking. His mood was depressed. He was noted to feel hopeless, helpless, and worthless. His energy level was low. Attention and concentration were poor. On an ASRS-V1.1 (ADHD symptom checklist), plaintiff was noted to

12

"very often" have trouble wrapping up the final details of a project, getting things in order when he has to do a task that requires organization, avoiding or delaying getting started on a task that requires a lot of thought, fidgeting or squirming with his hands or feet when he has to sit down for a long time, having difficulty keeping his attention when he is doing boring or repetitive work, concentrating on what people are saying to him, becoming distracted by activity or noise around him, feeling restless or fidgety, having difficulty unwinding and relaxing when he has time to himself. Dr. Burton assessed bipolar disorder, depressed type, and attention deficit hyperactivity disorder. "Needs treatment." She noted that whatever had been tried in the past had not helped. The rest of the record is illegible.

On January 26, 2012, plaintiff saw Dr. Burton (Tr. at 561). "Jim resents Richard because he is doing for Jim what he can't do for himself. He feels like he is giving up control." Dr. Burton told plaintiff he needs to start dealing with his childhood. Plaintiff reported an inability to get to sleep. His energy was low. He was only eating once a day. "Concentration is poor. Attention span is poor." She observed a depressed mood and affect. Dr. Burton assessed bipolar disorder, post traumatic stress disorder, and attention deficit hyperactivity disorder. She prescribed Seroquel (treats bipolar disorder), Lithium (treats bipolar disorder), Vyvanse (treats ADHD), Wellbutrin (antidepressant), and Adderol (treats ADHD).

On February 8, 2012, plaintiff was observed to be "very down and depressed" (Tr. at 589).

On February 23, 2012, plaintiff saw Dr. Burton (Tr. at 560). She noted pill rolling tremor[1] "to the point it hurts." His mood was still down. He reported that he feels uncomfortable everywhere, like he doesn't belong. "He had 4 days of sitting and staring." His

---

[1]A rhythmic circular movement of the opposed tips of the thumb and index finger, a form of tremor noted in Parkinson's and other syndromes.

13

energy was low. He was experiencing stomach aches. She noted a depressed mood and affect. She assessed bipolar disorder depressed type, post traumatic stress disorder, and attention deficit hyperactivity disorder. She prescribed seven medications with at least one being new.

On February 24, 2012, plaintiff's counselor noted that he had a depressed mood and his responses were flat (Tr. at 587). Plaintiff admitted having a problem with following through with things.

On February 29, 2012, plaintiff's counselor noted that his "mood continued to be depressed and his responses were mostly flat." (Tr. at 586). Plaintiff continued to have suicidal thoughts. "His new medications continue to cause him problems with new side effects." The counselor talked to plaintiff about his challenges with following through with things.

On March 14, 2012, plaintiff's counselor noted that plaintiff had not implemented much of what they had talked about (Tr. at 584). "Clinician talked with James about having a hard time with follow-through and he agreed."

On March 18, 2012, plaintiff saw Dr. Burton (Tr. at 559). She noted that plaintiff "loses track of what he is saying." She observed a pill rolling tremor. He had a blunted mood and a flat affect. Much of the record is illegible. Dr. Burton told plaintiff to continue his medications and it appears that she added three new ones.

On March 21, 2012, plaintiff was noted to have been tearful most of the weekend and was experiencing unregulated mood (Tr. at 583).

On March 22, 2012, plaintiff saw Dr. Burton (Tr. at 558). Part of the record is illegible, but she indicated that plaintiff felt like crying a lot, he "feels like he is at the end of his rope with the depression." He said he felt stupid, he had instances of a high pulse rate. Dr. Burton observed that he had a depressed mood and a flat affect. He was taking Seroquel (treats bipolar disorder), Wellbutrin (antidepressant), Buspirone (treats anxiety), and several other

14

illegible medications.  She added Xanax (for anxiety), and several other new medications which are illegible.  Her diagnoses were bipolar disorder, depressed type; post traumatic stress disorder; attention deficit hyperactivity disorder; generalized anxiety disorder; and panic disorder.

On April 4, 2012, plaintiff told his counselor he had been tearful most of the weekend (Tr. at 581).  He "continues to experience unregulated mood."  He reported "serious thoughts" of suicide this week.

On April 5, 2012, Dr. Burton observed that plaintiff's hygiene was poor.  She noted that he has problems making decisions, he has no initiative, he has constant obsessional thoughts.  His energy was low.  He had a lot of guilt and self-hatred.  He was noted to feel hopeless and suicidal.  "He slashed his wrists last week in a suicide attempt."  In a SLUMS[2] examination, plaintiff scored a 25, indicating mild neurocognitive disorder.  A score of 20 or below indicates dementia (Tr. at 556-557).

That same day she wrote a letter to whom it may concern (Tr. at 567, 609).  "I am the treating psychiatrist for Mr. James Monroe.  Jim Monroe will need at least three to five years of psychotherapy two to three times per week before he will be able to work.  This is to treat his Post-Traumatic Stress Disorder (PTSD) symptoms.  If his dementia does not improve he will never be able to work."

On April 10, 2012, Dr. Burton completed a Medical Source Statement - Mental (Tr. at 575-576).  She found that plaintiff was markedly limited (i.e., interferes seriously with the ability to function independently) in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions

---

[2]St. Louis University Mental Status exam.

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

She found that plaintiff was extremely limited (i.e., impairment level precludes useful functioning in this category) in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

16

Dr. Burton completed a depression questionnaire and at the conclusion of that form wrote, "James suffers from severe post traumatic stress disorder, panic disorder, attention deficit disorder and bipolar type 1. He will need at least 3 years of twice weekly psychotherapy to have even a minimal chance of employment." (Tr. at 570-572).

On April 20, 2012, plaintiff saw Dr. Burton (Tr. at 614). Plaintiff noted a lot of difficulty with activities of daily living. "We discussed his recent memory loss." Much of the record is illegible, but she did note "dementia."

On May 3, 2012, plaintiff saw Dr. Burton (Tr. at 613). She noted that plaintiff had a tendency to get very irritable. Plaintiff reported feeling lost. Dr. Burton noted a depressed mood and affect. She wrote "dementia" in the notes but the rest is illegible.

On May 24, 2012, plaintiff saw Dr. Burton (Tr. at 612). Most of this record is illegible; however, she did write, "he had a very long crying spell. . . . Jim is scared of what will happen to him in the future."

On June 7, 2012, Dr. Burton added an addendum to her April 5, 2012, letter: "James's dementia is worsening and there are more things that Jim is not safe to do on his own. The dementia is worsening and he will continue to deteriorate and be less functional." (Tr. at 609).

C.      SUMMARY OF TESTIMONY

During the June 14, 2012, hearing, plaintiff testified; and Gary Weimholt, a vocational expert, testified at the request of the ALJ.

1.      Plaintiff's testimony.

At the time of the hearing plaintiff was 50 years of age and is currently 52 (Tr. at 50). He was 6 feet tall and weighed approximately 145 pounds (Tr. at 50). Plaintiff is divorced and has a 28-year-old son (Tr. at 50). Plaintiff was living in an apartment with his 89-year-old mother (Tr. at 51). For a while he slept on a pull-out couch, but then his mother let him start

17

sleeping in his late father's bed (Tr. at 73). Plaintiff does things like getting her mail for her or

taking the trash out (Tr. at 51). He does not take care of his mother's personal needs (Tr. at

51). Plaintiff and his mother both cook but his part is limited to heating up frozen meals (Tr.

at 52). Plaintiff runs the sweeper because his mother can't (Tr. at 66). Plaintiff does the

laundry (Tr. at 67). Plaintiff's brother takes their mother to her doctor appointments and to get

her hair done (Tr. at 67).

Plaintiff has not had a driver's license for about two years (Tr. at 52). He noticed that

he had 90 days to get it renewed and he didn't get it done, so it just lapsed (Tr. at 52). Plaintiff

has a friend who takes him to his appointments (Tr. at 52). Plaintiff goes to a counselor once a

week, he goes to his psychiatrist every other week, and he may go over to his friend's house

once a week (Tr. at 52). Plaintiff's brother does the shopping for him (Tr. at 53).

Plaintiff has a high school education (Tr. at 53). Plaintiff has no income (Tr. at 53). His

mother pays the bills with her Social Security retirement income (Tr. at 54). Plaintiff gets food

stamps which he gives to his brother who shops for plaintiff (Tr. at 54). Plaintiff does not go

shopping because he doesn't like to be any place except his mother's apartment or his friend's

home (Tr. at 54). Plaintiff does not even feel comfortable at his son's home (Tr. at 54). He

does not want to run into anyone he knows (Tr. at 59). His son picks him up and takes him for

a visit with his grandsons, but he doesn't interact much, he just sits and watches them visit (Tr.

at 59). Plaintiff has actually had panic attacks for no reason while in the car with his son or

his brother (Tr. at 60). Sometimes plaintiff has panic attacks when he sits on the deck because

he thinks people driving by are looking at him (Tr. at 60). Plaintiff's panic attacks are physical

and are overwhelming (Tr. at 61). This happens two or three times a week, and it takes about

a half an hour for his medication to start working and calming him down (Tr. at 61-62).

18

Plaintiff is on Medicaid (Tr. at 55). He tries to remember to take his medications, but his mother helps remind him (Tr. at 56-57). If plaintiff's mother were not frequently asking him if he'd taken his medication, he would probably not take it all the time (Tr. at 57).

Plaintiff gets up around 11:00 in the morning and sits on the deck smoking and drinking coffee, trying to have some peace "before everything hits." (Tr. at 57). Plaintiff watches soap operas and game shows with his mother, chats with her and has coffee with her (Tr. at 72). Plaintiff sometimes reads the news on his computer, but he doesn't do much else on the computer (Tr. at 72). He worked with computers a lot in his life, but then the technology took off and left him behind (Tr. at 72). Plaintiff mostly just keeps his mother company (Tr. at 72). Plaintiff feels safe at his friend's because his friend does not let anyone come over, and no one comes to his mother's house except his brother and his son (Tr. at 73).

Plaintiff has had increasing difficulty remembering things (Tr. at 57-58). He has problems remembering what day of the week it is, and he brings his planner with him everywhere because he has to write things down and refer to the planner (Tr. at 59). Several people at Pathways were supposed to help him fill out his disability paperwork but they were no help at all (Tr. at 72-73). His brother was going to help him, but he didn't (Tr. at 73). His friend Richard eventually helped him fill it out (Tr. at 73). Plaintiff does not remember things like taking needing to take a shower or brush his teeth because those things are very low priority for him (Tr. at 75). It takes too much effort when all he is going to be doing is sitting there with his mom (Tr. at 75). He used to take a shower every day, but now he just thinks it's too big of an undertaking (Tr. at 76).

Plaintiff lacks any kind of energy (Tr. at 62). He is on medication that is supposed to perk him up, but it doesn't work (Tr. at 62). It is hard for plaintiff to make himself go do anything, and he has no motivation (Tr. at 63). "I know there's things that I should do and I

need to do, but like even taking a shower, it just seems overwhelming to me to have to get in there." (Tr. at 63). His mother reminds him to shower after about four or five days (Tr. at 63). Plaintiff was "pill rolling" -- rubbing his thumb nail with his index finger (Tr. at 64). He did it so much that his nails were shiny (Tr. at 64). His doctor gave him a medication for that which helped a lot (Tr. at 64). Plaintiff does not have involuntary tremors or shakes (Tr. at 65).

Plaintiff has been depressed off and on since he was about five (Tr. at 74). He would spend an entire day in his room crying and would consider trying to commit suicide with a plastic knife (Tr. at 74). Plaintiff was molested four times throughout his life and the incidents when he was the youngest "messed" with him (Tr. at 74). Plaintiff cannot ever remember a day when he was happy (Tr. at 75). He often regrets getting up instead of looking forward to getting up (Tr. at 75).

Plaintiff does not have any mania physically, but he feels it mentally (Tr. at 67-68). Plaintiff fixates on his past and it drives him nuts (Tr. at 68). His psychiatrist is hoping to get him feeling better within a year or so, but she said it was going to take some time (Tr. at 68). His current medications are better than ones he was on in the past, but they don't fix his problems (Tr. at 68). Dr. Ahmed was no help -- she just prescribed drugs and didn't pay attention to him when he tried to tell her those had not worked in the past for him (Tr. at 69). Dr. King did the same thing -- they just switched pills around and didn't talk to him to find out what was going on with him (Tr. at 69-70).

Xanax keeps plaintiff calm during the day (Tr. at 70). The medications he takes at night knock him out (Tr. at 70). The medication that is supposed to give him energy hasn't done anything for him (Tr. at 70). He takes an antidepressant after meals (Tr. at 70).

Plaintiff does not have nightmares but he does have night sweats (Tr. at 70).

Plaintiff worked at the Tribune but left that job (Tr. at 71).  The people he worked with liked to party and talked a lot about their drugs and alcohol (Tr. at 71).  He did not want to be in that environment, he felt like he needed to be someplace secure which was at home with his mother (Tr. at 71).  He was happy that his mom let him move in with her (Tr. at 71).  Plaintiff had problems in the past with drugs and alcohol, but he has been clean for four or five years (Tr. at 71-72).  Plaintiff attended a lot of support groups in the beginning (Tr. at 72).  Now he only goes where he knows it will be safe and there will be no alcohol or drugs -- home and his son's (Tr. at 72).

2.      **Vocational expert testimony.**

Vocational expert Gary Weimholt testified at the request of the Administrative Law Judge.  Plaintiff's past work at the newspaper is a warehouse laborer, DOT 922.687-058, medium, unskilled (Tr. at 85-86).

If a hypothetical person had no physical limitations but was limited to simple routine tasks in a low stress job environment with only occasional decision making required, only occasional changes in the work setting, and only occasional judgments required on the job, and the person could have only occasional interaction with the public, co-workers and supervisors, that person could not perform plaintiff's past work (Tr. at 87).  The vocational expert then reconsidered and testified that such a person could perform plaintiff's past work as a warehouse laborer (Tr. at 87).  The hypothetical person could also work as a hand packager, an inspector/hand packager, or an assembler of small products (Tr. at 88).

The second hypothetical was the same as the first except the person would be off task at least 20 to 25 percent of the time (Tr. at 88).  Such a person could not work (Tr. at 88).

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Ross Stubblefield entered his opinion on July 2, 2012 (Tr. at 22-36).  Plaintiff's last insured date was March 31, 2014 (Tr. at 24).

Step one.  Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date (Tr. at 24).

Step two.  Plaintiff has the following severe impairments:  major depressive disorder, bipolar disorder, and anxiety disorder (Tr. at 24).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 25).

Step four.  Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels but is limited to simple, routine tasks in a low-stress job environment, defined as only occasional decision making required, only occasional changes in the work setting, and only occasional judgment required on the job.  He is further limited to only occasional interaction with the public, coworkers and supervisors (Tr. at 26).  With this residual functional capacity, plaintiff can return to his past relevant work as a warehouse laborer (Tr. at 34).

Step five.  Alternatively plaintiff is capable of performing other jobs available in significant numbers including hand packager, inspector/hand packer, or small products assembler (Tr. at 35).

## VI.     WEIGHT GIVEN TO TREATING PSYCHIATRIST

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of plaintiff's treating psychiatrists, Ambreen Ahmed, M.D., and Glenna Burton, M.D.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d

22

917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

In evaluating Dr. Burton's opinion, the ALJ stated that her opinion was "inconsistent with the objective evidence" without identify what objective evidence contradicted her opinion (Tr. at 31). He stated that, "She noted that it was a necessity that the claimant be seen a few times per week, yet she had been seeing him once or twice per month." However, the records reflect that plaintiff was seeing a counselor many times each month.[3] Dr. Burton stated that plaintiff needed psychotherapy, she did not say that he needed to see a psychiatrist twice a week. The ALJ stated that, "[P]revious treatment records do not show that the claimant had dementia; in fact, Dr. Burton noted that the claimant's memory was good in one of her treatment notes." When Dr. Burton stated that plaintiff's memory was good, she indicated that it had not been formally tested and this was based on the office visit but that he had not done much of anything during the office visit. Furthermore, several of Dr. Burton's treatment records mention dementia. It is somewhat problematic that her records are largely illegible; however, if her treatment records include a discussion about dementia and her opinion

---

[3]In the summary of medical records in this order, I have not included every record of plaintiff's counseling as the number of visits was numerous. The ones included in the summary were representative of the treatment over a long period of time.

Case 2:13-cv-04258-REL   Document 23   Filed 03/23/15   Page 23 of 25

includes the fact that plaintiff suffers from dementia, I think it can reasonably be assumed that she at least suspected dementia when she was preparing her treatment notes. In addition, a review of the treatment records from plaintiff's other psychiatrists and his counselors corroborates the fact that plaintiff has struggled with memory and concentration problems at least since his alleged onset date.

The ALJ barely mentions the opinion of another treating psychiatrist, Dr. Ahmed. Dr. Ahmed found that plaintiff was markedly limited in his ability to maintain attention and concentration. She also found that plaintiff was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and to sustain an ordinary routine without special supervision. She found that plaintiff was extremely limited in his ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The ALJ failed to discuss the opinion of Dr. Ahmed other than to say that her opinion that plaintiff can understand, remember and carry out simple instructions is "given some weight" (Tr. at 29).

I find that the treatment records of plaintiff's treating psychiatrists and his counselors establish that he would be off task at least 20 to 25 percent of the time due to problems with concentration, memory, and the other abilities discussed above. The vocational expert testified that such a person could not perform substantial gainful activity.

VII. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in failing to give controlling weight to the opinions of plaintiff's treating psychiatrists. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

24

ORDERED that the decision of the Commissioner is reversed.  It is further

ORDERED that this case is remanded for an award of benefits and for a determination as to whether plaintiff is capable of handling his own funds, given the evidence in the record of a previous gambling addiction and symptoms of mania associated with his bipolar disorder.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 23, 2015

25